In re NETTEL CORPORATION, INC., et al., Debtors.

Wendell W. Webster, Trustee, Plaintiff,

v.

The Management Network Group, Inc., et al., Defendants.

Bankruptcy No. 00–01771.

Adversary No. 02–10125.

United States Bankruptcy Court, District of Columbia.

Nov. 22, 2006.

Linda M. Correia, Webster, Fredrickson & Brackshaw, Washington, DC, Brian H. Meldrum, Catherine L. Steege, Jenner & Block, LLC, Chicago, IL, for Plaintiff.

Morton A. Faller, Stephen A. Metz, Shulman, Rogers, Gandal, Pordy & Ecker, Rockville, MD, for Defendants.

*DECISION REGARDING THE DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT AND THE PLAINTIFF'S CROSS–MOTIONS FOR SUMMARY JUDGMENT*

S. MARTIN TEEL, JR., Bankruptcy Judge.

Before the court are cross-motions for summary judgment filed by the various parties to this proceeding. The plaintiff, Wendell W. Webster, is the trustee in the case under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101 et *seq.*, of NETtel Corporation, Inc. ("NETtel"). Pursuant to 11 U.S.C. §§ 547 and 550, he seeks to avoid and recover transfers allegedly made by NETtel to the defendants The Management Network Group, Inc. ("TMNG") and TMNG Technologies, Inc. ("TMNG Tech") (formerly known as Tri–Computer Services, Inc. ("Tri–Com")). As to the claims against both defendants, the court will grant partial summary judgment ruling that Webster is not barred from pursuing under § 550 any of the transfers he establishes are avoidable. As to TMNG, the court will further grant partial summary judgment:

(1) ruling that Webster has established the elements of § 547(b) as to all of the transfers at issue;

(2) dismissing, based on § 547(c)(4), the claim against TMNG regarding $15,843.00 of the last two preference payments made to it;

(3) ruling that with respect to the remaining $511,246.28 of preference claims against TMNG, its § 547(c)(2) affirmative defense is invalid except as to $164,466.46 of the payments; and

(4) ruling that neither a § 547(c)(2) defense nor a § 547(c)(4) defense is available to TMNG with respect to $200,345.92 of the amounts paid by a check dated July 17, 2000, and with respect to $109,939.00 of the amounts paid by the last five preference checks issued to TMNG, thus establishing that Webster is entitled to recover that $310,284.92, in the aggregate, of his claims.

Summary judgment regarding the claims against TMNG will otherwise be denied.

That leaves for trial regarding the claims against TMNG only $200,961.36 in claims, and specifically these matters:

(1) TMNG's § 547(c)(2) defense as to $164,466.46 of the preference claims against it (consisting of $23,643.51 paid by a check dated June 26, 2000; $25,000.00 paid by a check dated June 27, 2000; and $115,822.95 paid as part of a check dated July 17, 2000); and

TMNG' s § 547(c)(4)· affirmative defense as to:

(a) the $48,643.51 paid by the checks dated June 26, 2000, and June 27, 2000 (for which TMNG is also asserting a § 547(c)(2) defense), and

(b) $36,494.90 of the amounts paid by the check dated July 17, 2000 (in addition to any part of that check shown to come within the § 547(c)(2) defense because the two defenses do not overlap).

As to TMNG Tech, the court will further grant partial summary judgment:

(1) ruling that Webster has established the elements of § 547(b) as to a $12,672.21 payment (but not ruling that Webster has made that showing with respect to two payments, in the amounts of $66,042.26 and $64,877.01, because there is a dispute whether those transfers were to or for the benefit of TMNG Tech as a creditor);

(2) ruling that TMNG Tech's § 547(c)(2) affirmative defense is invalid with respect to the $12,672.21 preference payment that TMNG Tech acknowledges was made to it.

However, the court will otherwise deny the parties' cross-motions for summary judgment. That leaves for trial regarding the claims against TMNG Tech only:

(1) Webster's claim that the payments of $66,042.26 and $64,877.01 were to or for TMNG Tech's benefit; and

(2) TMNG Tech's affirmative defense under § 547(c)(1) with respect to the $12,672.21 payment to it.

I

PROCEDURAL BACKGROUND

NETtel filed its bankruptcy petition under chapter 11 of the Bankruptcy Code on September 28, 2000. On October 23, 2000, this court converted NETtel's case to chapter 7, and Webster subsequently became the trustee in the case. NETtel's case is being jointly administered with the case of its corporate parent NETtel Communications, Inc. ("NETtel Communications"), but that joint administration (a procedural convenience not amounting to substantive consolidation) has no impact on the issues in this proceeding. Webster later commenced this adversary proceeding.

Both Webster and the defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as incorporated by Fed. R. Bankr.P. 7056. Under this rule, judgment may be granted in one party's favor if the moving party can show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court must deny summary judgment where there is a genuine issue as to any material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the movant makes a properly supported motion, the burden shifts to the opposing party to demonstrate specific facts showing that there is a genuine issue for trial. *Id.*

If the moving party does not bear the burden of proof at trial on an issue, summary judgment may be granted if the moving party shows "that there is an absence of evidence to support the nonmov-

ing party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant alleges that the opposing party lacks proof to establish requisite elements of its case, the movant must show the absence of such facts. *Id.* The court must view the opposing party's evidence in a light most favorable to nonmovant's position and draw inferences in favor of that party, provided such inferences are justifiable or reasonable. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Both defendants seek summary judgment against Webster on the ground that he cannot recover any voided transfers under 11 U.S.C. § 550 because the recovery of such a transfer would not benefit the creditors of the estate. In addition, they seek summary judgment with respect to affirmative defenses unique to each defendant. Finally, TMNG Tech advances additional arguments in opposition to the affirmative motion for summary judgment filed by Webster in favor of his claims. The court considers each of these arguments in turn.

## II

### THE DEFENDANTS' ARGUMENT REGARDING § 550

Based on a cash collateral order entered in the main case (the "Cash Collateral Order") (Docket Entry ("DE") No. 50 in Case No. 00–01771), the defendants argue that Webster is not eligible to pursue recoveries of avoidable transfers under § 550 because the Cash Collateral Order gave certain secured creditors a security interest in any § 550 recoveries. The facts are not in dispute, but as a matter of law the defendants' argument must fail.

### A. Secured Creditors' Interests in Preference Recoveries

Prior to the conversion of the case to chapter 7, NETtel attempted to obtain sufficient funds to permit it to continue to operate its telecommunications business in chapter 11. Its primary secured lenders— Nortel Networks, Inc. ("Nortel"), Allied Capital Corporation ("Allied Capital"), and Williams Communications, Inc. ("Williams")—had loaned NETtel approximately $92 million, all of which was secured through pre-petition liens held against all of NETtel's property. (Cash Collateral Order at ¶¶ 7–8).

NETtel entered into an agreement (embodied with certain modifications in the Cash Collateral Order) with Nortel as administrative agent for itself, Allied Capital, and Williams. This agreement allowed NETtel to use certain pre-petition collateral and the cash proceeds arising out of the sale of pre-petition collateral to continue operating NETtel's business as a chapter 11 debtor-in-possession. (*Id.* at ¶ 6). In exchange, the lenders were granted a first priority security interest in all of NETtel's assets and post-petition collateral, including any amount recovered pursuant to §§ 547 and 550. (*Id.* at ¶ 9).

This court approved the parties' agreement in the Cash Collateral Order, but with certain conditions. Among the conditions added by the court was a proviso that the secured lenders' new liens would be valid "only to the extent that Nortel as administrative agent for itself and the Lenders' pre-petition liens either (a) are valid and perfected pre-petition liens and security interests or (b) to the extent Debtor's use of Lenders' collateral or cash collateral are not fully replaced with post-petition assets of equal value." (*Id.* at ¶ 5 n. *). In other words, NETtel's secured lenders could only assert a lien with respect to collateral already subject to a pre-

petition lien except insofar as that collateral was sold and not replaced with post-petition assets of equivalent value, in which case the lenders could reach other assets of the estate (including the preference actions at issue here).

### B. *Recovery of Transfers under 11 U.S.C. § 550*

The defendants argue that summary judgment should be granted in their favor because Webster has not demonstrated that recovery for any voided preferences would be "for the benefit of the estate" as required by 11 U.S.C. § 550(a). *See Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir.1991) ("Courts considering the issue ... have, with unanimity, concluded that a trustee or a debtor-in-possession of a bankruptcy estate cannot maintain an avoidance action under § 548 unless the estate would be benefitted by the recovery of the transferred property.") Section 550 states in pertinent part:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, *for the benefit of the estate*, the property transferred, or,

if the court so orders, the value of such property....

11 U.S.C. § 550(a) (emphasis added).

Although not defined by the Bankruptcy Code, the bankruptcy "estate" refers generally to "[a] debtor's legal and equitable interests in property at the beginning of a bankruptcy case where the property is subject to administration." *Black's Law Dictionary* (8th ed.2004).[1] It is "a statutory term that Congress used to denote the asset side of the bankruptcy balance sheet." *Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 823 (8th Cir.2004) ("*Stalnaker II*")(quoting *Stalnaker v. DLC, Ltd. (In re DLC, Ltd.)*, 295 B.R. 593, 607 (8th Cir. BAP 2003)) ("*Stalnaker I* "). "In virtually every case, recovery of any property benefits the estate." *Id.* (quoting *Stalnaker I*, 295 B.R. at 607).

■ The defendants contend that any recovery by Webster of the alleged preferential transfers to the defendants would benefit only NETtel's principal secured lenders because those creditors have a lien on the proceeds of any preference recoveries far in excess of the amounts sought by Webster here. They argue that Webster has provided no evidence that preference recoveries will be distributed to unsecured creditors of the estate, and that absent such proof Webster cannot recover under § 550.[2] The defendants cite *Congress*

---

**1.** Neither "estate" nor "property of the estate" are listed among the defined terms of the Bankruptcy Code found in 11 U.S.C. § 101. Section 541 of the Code, however, states that an estate is created whenever a bankruptcy case commences under 11 U.S.C. §§ 301, 302, or 303, and further provides that the estate is "comprised" of, *inter alia*, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). When an interest in property is recovered under § 550(a), it becomes property of the estate. 11 U.S.C. § 541(a)(3).

**2.** Webster has provided deposition testimony that the liens possessed by the secured lend-

ers *may* not reach any or all of the proceeds from Webster's actions either because the estate replaced the collateral used or sold with assets of equal value or as a result of settlement negotiations between the secured lenders and Webster. (Webster Dep. at 32–33, 41 (DE No. 85 at Ex. 1)). This testimony is insufficient to defeat a motion for summary judgment. As the party with the burden of proof on this issue, Webster must produce some evidence indicating that the recovery of preferential transfers to the defendants *will* benefit the estate, not that it *could* benefit the estate. The mere possibility of a benefit to the estate does not satisfy Webster's burden under § 550. Nonetheless, because the defendants' unduly narrow definition of the

*Credit Corp. v. AJC Int'l*, 186 B.R. 555 (D.P.R.1995), and *Barber v. McCord Auto Supply, Inc. (In re Pearson Indus., Inc.)*, 178 B.R. 753 (Bankr.C.D.Ill.1995), for the proposition that a preference recovery that is remitted entirely to a chapter 7 debtor's secured creditors does not benefit the estate because it does not benefit the debtor's unsecured creditors. *See Congress Credit Corp.*, 186 B.R. at 559 ("A [c]hapter 7 trustee should not act as a mere conduit for the benefit of secured creditors only.") (quoting *In re Pearson Indus., Inc.*, 178 B.R. at 761).

■■■■ This court does not find the authority cited by the defendants to be persuasive. The *Congress Credit* and *Pearson Industries* courts conflate the definition of "the estate" for purposes of § 550 with the fiduciary duties of a chapter 7 trustee, which run only to a debtor's unsecured creditors. *See Congress Credit Corp.*, 186 B.R. at 559; *Pearson Indus., Inc.*, 178 B.R. at 761.[3] But this does not mean that a bankruptcy trustee may not recover a preferential transfer unless the transfer is scheduled for distribution to holders of unsecured claims; to the contrary, "[s]ection 550(a) speaks of benefit to *the estate*—which in bankruptcy parlance denotes the set of all potentially interested parties—rather than to any particular class of creditors." *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 293 (7th Cir.2003) (emphasis in original). As the Bankruptcy Appellate Panel for the Ninth Circuit noted in *En-*

*serv Co., Inc. v. Manpower, Inc./California Peninsula (In re Enserv Co., Inc.)*, 64 B.R. 519 (9th Cir. BAP 1986):

> In the instant case the preference is being recovered for the benefit of the estate even though it is used to pay a secured creditor. There is nothing abusive in this. Section 547 mandates that each creditor must share equally with others of its class. . . . [A] secured creditor . . . is entitled to be paid from the proceeds of its collateral[ ] ahead of the unsecured creditors, even if these creditors are never paid. The [Bankruptcy] Code sets an elaborate list of priorities for payment from the estate. . . . Section 547 was designed in part to see that those priorities are not circumvented.

*Id.* at 521–22.

*In re Enserv* involved a chapter 11 debtor-in-possession rather than a chapter 7 trustee, but the principle applies in both instances. Indeed, the fatal flaw in the reasoning of the courts in *Congress Credit* and *Pearson Industries* is that those courts insisted on imposing a separate definition of the term "estate" for purposes of chapter 7 of the Bankruptcy Code than the one used in chapter 11 cases. But "the bankruptcy 'estate' is not synonymous with the concept of a pool of assets to be gathered for the sole benefit of unsecured creditors." *Stalnaker II*, 376 F.3d at 823. Instead, Congress crafted a single, straightforward provision that allows a trustee to recover preferences any time

---

phrase "benefit to the estate" is wrong as a matter of law, and because there is no genuine dispute that a recovery by Webster would benefit the estate as that phrase is properly understood, the court will grant summary judgment in favor of Webster on this point.

3. The courts' confusion on this point is understandable. Ordinarily, a chapter 7 trustee would abandon property of the debtor in which it has no equity because, on the one

hand, the estate available for unsecured creditors would be diminished by commissions and other expenses incurred in maintaining or selling the property for the benefit of one secured creditor, whereas, on the other hand, that creditor can defend its own interests by seizing its collateral. Numerous courts, including this one, have denied proposed sales of fully encumbered property by chapter 7 trustees for this very reason.

transferred assets should have been included in the debtor's estate at the commencement of the case. Congress did not discriminate between encumbered and unencumbered assets in drafting § 550(a), and this court will not engage in such discrimination in interpreting it.

■ A defender of the *Congress Credit* and *Pearson Industries* decisions might object that the court's disagreement with these opinions is really a matter of semantics—that while it might be true that encumbered preference recoveries benefit the estate as a technical matter, it would constitute a breach of the chapter 7 trustee's fiduciary duty to pursue fully encumbered preference actions. *See Rambo v. Chase Manhattan Mortgage Corp. (In re Rambo)*, 297 B.R. 418, 433 (Bankr.E.D.Pa. 2003) ("The Chapter 7 trustee's primary role is to liquidate property for the benefit of unsecured creditors and not for the benefit of secured creditors or the debtor."). But the trustee only has a fiduciary duty to abandon property if the maintenance or sale of that property would benefit only a secured creditor *and* was paid for by the estate as a whole. So long as the secured creditor pays for the maintenance or liquidation of its collateral, the trustee does not breach her fiduciary duties.

■ In this case, NETtel's secured lenders hold liens on *all* of NETtel's assets. Webster is paid out of funds that would otherwise go to the secured lenders, not funds that would be distributed to

NETtel's unsecured creditors. So long as its bills are paid out of funds earmarked for the secured lenders, Webster's preference actions do nothing to upset his "primary role" as fiduciary for the NETtel's unsecured creditors. Moreover, the proceeds of Webster's preference recoveries may be distributed at least in part to the NETtel's unsecured creditors. If anything, Webster owes the unsecured creditors a fiduciary duty to pursue preference actions at least until it is apparent that recoveries on such actions will never be distributed to the NETtel's unsecured creditors.

Webster's actions cannot harm the NETtel's unsecured creditors, but they may yet help them. Because there is no evidentiary dispute over either of these points, and because each suffices to justify Webster's pursuit of § 550 recoveries, the court will grant summary judgment for Webster with respect to this issue even though his affirmative motion for summary judgment does not address the issue.

## III

### AVOIDABILITY OF THE TRANSFERS TO TMNG

■ Webster seeks to recover eight payments made to TMNG by NETtel in response to various invoices sent to NETtel by TMNG. Webster has demonstrated that each of these payments is avoidable under § 547(b) unless TMNG can establish an affirmative defense.[4] Beyond its argu-

---

4. TMNG provides a simple assertion that it disputes the avoidability of the transfers under § 547(b), but it does not provide any arguments in support of its position. The court will treat TMNG's perfunctory response as a concession to the merits of Webster's claim-in-chief. TMNG does not dispute that the payments were made to it as a creditor on account of antecedent debts. While some of the checks under examination here were is-

sued outside the preference period (which began on June 30, 2000), the checks were all honored after the preference period began. Under *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), these checks are all subject to preference actions under § 547(b). *Id.* at 397–402, 112 S.Ct. 1386. In addition, NETtel was insolvent within the meaning of 11 U.S.C. § 101 when it made each of the eight payments. (Dubin-

ment that the Cash Collateral Order bars Webster from making recoveries under § 550 of any avoided transfers, TMNG requests summary judgment with respect to its two affirmative defenses to Webster's claim. The first defense is that NETtel's payments to TMNG were made during the ordinary course of business pursuant to § 547(c)(2). The second is a new value defense pursuant to § 547(c)(4). For both of these arguments, TMNG has the burden of proof at trial. 11 U.S.C. § 547(g). Webster has filed a cross-motion for summary judgment with respect to both defenses.

## A. "Ordinary Course of Business" Defense under § 547(c)(2)

TMNG argues that the eight payments at issue here were made in the "ordinary course of business" pursuant to 11 U.S.C. § 547(c)(2). Under that provision, a transfer made within the preference period will not be avoided if the transfer was

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; *and*

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (emphasis added). TMNG must satisfy all three prongs of the standard to sustain its "ordinary course" defense. In this case, TMNG cannot satisfy the second requirement of § 547(c)(2) as to a large part of the preference payments. As to the balance of the payments, the parties are in agreement that the first

prong of § 547(c)(2) applies,[5] and with respect to the third prong, neither party has shown that summary judgment is appropriate.

## 1. *Legal standard as to § 547(c)(2)(B) prong*

"The courts look to the course of the conduct between the debtor and the transferee in evaluating § 547(c)(2)(B)." *White v. Bradford (In re Tax Reduction Inst.),* 148 B.R. 63, 72 (Bankr.D.D.C.1992). "If the transfer[s][are] out of the ordinary course of the business affairs between the parties, even viewed in a vacuum, it becomes unnecessary to view the transfer against the background of all of the debtor's affairs." *Id.* at 74. "[T]he most important thing is not that the dealings between the debtor and the allegedly favored creditor conform to some industry norm but that they conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period." *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1032 (7th Cir.1993).

"However, 'there is no precise legal test which can be applied' in determining whether payments by the Debtor during the ninety day preference period were 'made in the ordinary course of business[;]' 'rather, th[e] court must engage in a peculiarly factual analysis.'" *Trinkoff v. Porters Supply Co., Inc. (In re Daedalean, Inc.),* 193 B.R. 204, 211 (Bankr.D.Md.1996) (quoting *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991) (further quotation omitted)). "Among the factors courts consider in determining whether transfers are ordinary in relation to past

sky Report at 3 (DE No. 73 at Ex. 31)); 11 U.S.C. § 547(f) (presumption of insolvency).

**5.** Webster stipulates that the payments at issue were made in connection with a debt

incurred in the ordinary course of business between TMNG and NETtel as required by § 547(c)(2)(A).

practices are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and[ ] 4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Sulmeyer v. Suzuki (In re Grand Chevrolet, Inc.),* 25 F.3d 728, 732 (9th Cir.1994). As stated in *Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.),* 153 F.3d 915 (8th Cir.1998):

> The controlling factor is whether the transactions between the debtor and the creditor, both before and during the ninety-day period, were consistent. *See Lovett,* 931 F.2d at 497. "[T]he analysis focuses on the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90–day period reflected 'some consistency' with that practice." *Id.* at 498.

*Id.* at 917. "[T]he hallmark of a payment in the ordinary course is consistency with prior practice...." *Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.),* 132 F.3d 104, 110 (1st Cir.1997) (citing *WJM, Inc. v. Mass. Dep't of Pub. Welfare,* 840 F.2d 996, 1011 (1st Cir.1988)).

A genuine dispute of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Farmland Indus., Inc. v. Grain Bd. of Iraq,* 904 F.2d 732, 736 (D.C.Cir.1990) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505 (1986)). Although the § 547(c)(2)(B) inquiry is fact-bound, that does not preclude summary judgment in a trustee's favor if the evidence does not reasonably support a find-ing that § 547(c)(2)(B) applies. Here, the facts, albeit complicated, are undisputed, and under applicable legal standards they permit only one finding as to all but $164,466.46 of the preference payments to TMNG: that those preference payments were not "made in the ordinary course of business or financial affairs of the debtor and the transferee" as required by § 547(c)(2)(B). Because a factfinder could not reasonably make a finding in favor of TMNG under § 547(c)(2)(B) except as to $164,466.46 of the preference payments, summary judgment is appropriate in Webster's favor as to the § 547(c)(2) defense with respect to the remainder of the preference payments.

### 2. Facts re § 547(c)(2)(B) prong

The following facts are undisputed. TMNG provides consulting services to companies involved in the telecommunications industry. NETtel and TMNG began their business relationship in October 1999. The parties entered into a "Global Bulk Services Agreement," which states that "payments for undisputed invoices are due within 45 days after the invoice date." (Shanahan Aff. at Ex. 1. (DE No. 63 at Ex. A)).[6] Despite this provision, NETtel never issued a check within 45 days of a TMNG invoice. (Barkdoll Dep. Tr. II at 75–80, 129, Exs. 2, 15 (DE No. 63 at Appx. Ex. C)). Beginning in early 2000, TMNG initiated discussions with NETtel to determine whether NETtel had received any TMNG invoices, whether TMNG performed its work satisfactorily, and whether TMNG could do anything to resolve the issue of outstanding payments. (Shanahan Aff. ¶ 6). There is no indication in the record that TMNG threatened litigation against NETtel to obtain overdue payments, or that TMNG threatened to cease perform-

---

**6.** Neither party provided a copy of an executed Global Bulk Services Agreement. Both parties, however have included a copy of the unsigned document to demonstrate the content of the Agreement.

ing work for NETtel or refer the account to a collection agency. (Shanahan Aff. ¶ 6).

The payment history prior to the preference period may be summarized from the check transmittal documents as follows:

| Check No. and Date | Check Honored Date | Check Amount | Invoice No. | Invoice Amount | Invoice Date | Days Lapsed (Until Check Issued/ Until Honored) |
|---|---|---|---|---|---|---|
| # 100393 01/21/00 | 02/04/00 | 97,496.74 | AR2047 | 97,496.74 | 12/06/99 | 46/60 |
| # 102952 04/27/00 | 05/08/00 | 277,203.90 | AR1969 | 44,000.53 | 11/06/99 | 173/184 |
| | | | AR2043 | 56,699.25 | 12/06/99 | 143/154 |
| | | | 11100 | 127,377.50 | 01/11/00 | 107/118 |
| | | | AR2265 | 18,382.00 | 01/11/00 | 107/118 |
| | | | AR2138 | 30,744.62 | 01/12/00 | 106/117 |

NETtel issued two checks in response to six invoices in the pre-preference period, a ratio of three invoices for each check. There was a gap of three months and six days between the issuance of the checks.

 Two points must be emphasized regarding the range of the delay in making payments. First, although the delay (based on which invoices were designated for payment) ranged from 46 days to 173 days, that range disregards economic reality because it does not take into account that NETtel's first payment was for a later invoice than the oldest outstanding invoice. Because the amount of the first check exceeded the oldest outstanding invoice, NETtel's arbitrary designation of a later invoice as being paid did not change the fact that NETtel's debts to TMNG were reduced by an amount exceeding the oldest outstanding invoice. It is a debtor's delay in *reducing* the debts by an amount exceeding the oldest invoice that counts economically in assessing a debtor's delay in making payment of invoices.[7] Looking at NETtel's two payments based on the amounts of the oldest invoices that were equaled or exceeded by the payments, the range of delay in NETtel's satisfying the oldest invoices was 106 days to 143 days.[8]

7. Assume a debtor makes a payment of $100 to its creditor when it has one invoice outstanding for $100 that is 200 days old and another invoice outstanding for $200,000 that is 10 days old. The delay in making payment of its debts has, so far, reached 200 days. Assume that 150 days later, the debtor makes a second payment of $200,000 (which is 350 days since the $100 debt was invoiced and 160 days since the $200,000 debt was invoiced). For the two payments, the range of delay in paying the debtor's debts would be **160 days to 200 days.** It should not be viewed as a quite different range of **10 days to 350 days** when the debtor arbitrarily designates the first payment of $100 for application against the later invoice for $200,000. Once that debtor enters the preference period, a payment made on a further invoice at either 10 days or 350 days after the invoice date ought not be treated as comporting with the economic reality of what transpired in the pre-preference period.

8. Had NETtel paid the oldest invoice, the November 6, 1999, invoice, via the January 2000 check, none of the invoices paid by the January 2000 and April 2000 checks would have been paid in full earlier than 106 days or later than 143 days after issuance of the in-

Second, the invoices were not in even amounts. Accordingly, an accurate assessment of how promptly NETtel was paying invoices requires a review of the delay based on a dollar-weighted average. On a dollar-weighted basis, it took an average of 104.24 days from invoice date to check date, and 116.02 days from invoice date to the date the check was honored, for NETtel to make payment in the pre-preference period.

By the end of May of 2000, TMNG had invoiced NETtel for all of the amounts that were later paid in the preference period (amounts totaling $527,089.28), plus additional amounts. The earliest of the unpaid invoices, amounting to $285,484.33 for invoices dated February 7, 2000, were already 114 days old. In early June of 2000, TMNG's Chief Financial Officer, Edward Shanahan, discussed with NETtel controller Tom Aprahamian whether the parties could enter into a payment plan for outstanding receivables. On June 8, 2000, Shanahan and Aprahamian exchanged a series of e-mails outlining the terms of such a plan. (Shanahan Aff. at Ex. 3). Aprahamian explained that NETtel would be unable to pay $50,000.00 per week to become current on the outstanding debt, and informed Shanahan that NETtel could only afford $25,000.00 per week. He told Shanahan that NETtel expected a cash infusion of $35,000,000 in July of 2000.[9]

Shanahan requested more details about this cash infusion.

From these discussions in mid-June of 2000, the two parties entered into a *de facto* payment plan. (Barkdoll Dep. Tr. II at 106–07, Ex. 5 (DE No. 63 at Ex. C)). The "terms" of this unwritten plan obligated NETtel to make payments of $25,000.00 every week beginning in mid-June, a large payment in mid-July once the large cash infusion came through, and then additional weekly payments of $25,000.00 to make up any amount yet remaining. (Shanahan Aff. ¶ 8).

Between June 30, 2000, and September 28, 2000, TMNG contacted NETtel via telephone and e-mail to discuss the status of payments under the payment plan. (Shanahan Aff. at Ex. 3). NETtel made every payment owed under the plan, although a few payments were made a few days late. The checks were all honored during the 90–day preference period which commenced in July 2000, although the payment plan was agreed to in June 2000 before the preference period commenced. The chart below lists the date that NETtel's checks were issued and cashed, the invoices satisfied by each payment, and how long it took for each invoice to have a check issue and how long it took for each invoice to be satisfied with an honored check:

| Check Date | Check Honored Date | Check Amount | Invoice Date | Invoice No. | Invoice Amount Paid (p = partial payment of outstanding balance) | Days Lapsed (Until Check Issued/ Until Check Honored) |
| --- | --- | --- | --- | --- | --- | --- |

voice, and partial payment would have been made no earlier than 46 days after issuance of the invoice.

9. As the e-mails explain, the money was to come from Gold & Appel Transfer, S.A., of which Walter Anderson is the principal. Anderson's ventures held approximately 40% of NETtel.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6/26/00 | 7/5/00 | $ 23,643.51 | 3/3/00 | AR2289 | $ 23,643.51 | 115/124 |
| 6/27/00 | 7/17/00 | $ 25,000.00 | 2/7/00 | AR2271 | $ 25,000.00p | 141/161 |
| 7/17/00 | 7/27/00 | $352,663.77 | 2/7/00 | AR2175 | $182,530.50 | 161/171 |
| | | | 2/7/00 | AR2166 | $ 35,363.88 | 161/171 |
| | | | 2/7/00 | AR2167 | $ 20,654.70 | 161/171 |
| | | | 2/7/00 | AR2172 | $ 17,601.69 | 161/171 |
| | | | 2/7/00 | AR2271 | $ 4,333.56 | 161/171 |
| | | | 3/3/00 | AR2290 | $ 64,928.40 | 136/146 |
| | | | 3/3/00 | AR2291 | $ 27,251.04 | 136/146 |
| 8/3/00 | 8/17/00 | $ 25,782.00 | 4/10/00 | AR2376 | $ 1,313.00 | 115/129 |
| | | | 5/11/00 | AR2484 | $ 24,469.00 | 84/98 |
| 8/10/00 | 8/18/00 | $ 25,000.00 | 3/3/00 | AR2293 | $ 25,000.00p | 160/168 |
| 8/17/00 | 8/29/00 | $ 25,000.00 | 3/3/00 | AR2293 | $ 7,567.62 | 167/179 |
| | | | 3/3/00 | AR2296 | $ 12,180.38p | 167/179 |
| | | | 3/3/00 | AR2297 | $ 5,252.00 | 167/179 |
| 8/30/00 | 9/11/00 | $ 25,000.00 | 3/3/00 | AR2296 | $ 25,000.00p | 180/192 |
| 9/8/00 | 9/20/00 | $ 25,000.00 | 3/3/00 | AR2296 | $ 25,000.00p | 189/201 |

On a dollar-weighted basis, it took an average of 152.39 days (versus 104.24 days in the pre-preference period) from invoice date to check date, and 163.21 days (versus 116.02 days in the pre-preference period) from invoice date to the date the check was honored, for NETtel to make payment in the preference period. In other words, NETtel was approximately 47 to 48 days later on a dollar-weighted average in the preference period in making payments (and having those payments clear) than it was in the pre-preference period.[10] NETtel had become much more delinquent in making payments, and, as contemplated by the payment plan, NETtel engaged in an unprecedented frequency of payments designed to have NETtel become more current. Finally, the range of delay after the invoice date in issuing checks sufficient to pay the oldest outstanding invoices[11] was now 136 to 189 days after the invoice date, versus 106 to 143 days in the pre-preference period, with the bulk of the amounts paid (when the checks are applied first to the oldest invoices) having been paid pursuant to checks issued 160 days or later. This latter conclusion is demonstrated by applying the payments each time first towards one of the oldest invoices before paying any later invoice, as shown below when the previous summary is altered to delay application of a payment to an invoice when it was not of an oldest invoice (as indicated by strikeout) and to apply the payment instead to only oldest invoices (as indicated by the bold lettering):

10. Moreover, the delay figures for the preference period are somewhat misleading. Although NETtel issued a check to pay the April and May 2000 invoices within 115 and 84 days, respectively, these relatively small invoices would not have been paid at all had the preference period payments been applied to the oldest invoices first. Had the check for those invoices been applied to the remaining unpaid March 2000 invoice (resulting in a delay in payment from invoice date of 153 days instead of a range of 84 to 115 days), the contrast between the pre-preference and pref-erence periods with respect to the dollar-weighted average delay in making payment would be that much more striking.

11. For reasons previously discussed, in assessing the economic reality of how fast invoices were being paid, the factfinder should disregard NETtel's occasional designation of later invoices as being paid before older invoices were satisfied. See nn. 8 and 9, *supra*, and the text to which they relate.

| Check Date | Check Honored Date | Check Amount | Invoice Date | Invoice No. | Invoice Amount Paid (p = partial payment) | Days Lapsed (Until Check Issued/ Until Check Honored) |
|---|---|---|---|---|---|---|
| 6/26/00 | 7/5/00 | $23,643.51 | ~~3/3/00~~ 2/7/00 | ~~AR2289~~ AR2271 | ~~$23,643.51~~ $23,643.51p | ~~115/124~~ 140/149 |
| 6/27/00 | 7/17/00 | $25,000.00 | ~~2/7/00~~ 2/7/00 2/7/00 | ~~AR2271~~ AR2271 AR2175 | ~~$25,000.00~~ $5,690.05 $19,309.95p | ~~141/161~~ 141/161 141/161 |
| 7/17/00 | 7/27/00 | $352,663.77 | ~~2/7/00~~ 2/7/00 2/7/00 2/7/00 2/7/00 ~~2/7/00~~ 3/3/00 3/3/00 3/3/00 | ~~AR2175~~ AR2175 AR2166 AR2167 AR2172 ~~AR2271~~ AR2289 AR2290 AR2291 | ~~$102,530.50~~ $163,220.55 $35,363.88 $20,654.70 $17,601.69 ~~$4,333.56~~ $23,643.51 $64,928.40 $27,251.04 | ~~161/171~~ 161/171 161/171 161/171 161/171 ~~161/171~~ 136/146 136/146 136/146 |
| 8/3/00 | 8/17/00 | $25,782.00 | ~~4/10/00~~ ~~5/11/00~~ 3/3/00 | ~~AR2376~~ ~~AR2404~~ AR2293 | ~~$1,313.00~~ ~~$24,469.00~~ $25,782.00p | ~~115/129~~ ~~84/98~~ 153/167 |
| 8/10/00 | 8/18/00 | $25,000.00 | ~~3/3/00~~ 3/3/00 3/3/00 3/3/00 | ~~AR2293~~ AR2293 AR2296 AR2297 | ~~$25,000.00p~~ $6,785.62 $12,962.38p $5,252.00 | ~~160/168~~ 160/168 160/168 160/168 |
| 8/17/00 | 8/29/00 | $25,000.00 | ~~3/3/00~~ ~~3/3/00~~ 3/3/00 ~~3/3/00~~ | ~~AR2293~~ ~~AR2296~~ AR2296 ~~AR2297~~ | ~~$7,567.62~~ ~~$12,180.38~~ $25,000.00p ~~$5,252.00~~ | ~~167/179~~ ~~167/179~~ 167/179 ~~167/179~~ |
| 8/30/00 | 9/11/00 | $25,000.00 | 3/3/00 | AR2296 | $25,000.00p | 180/192 |
| 9/8/00 | 9/20/00 | $25,000.00 | 3/3/00 | AR2296 | $25,000.00p | 189/201 |

Note that the only payments made no later than 143 days after the invoice date were: $23,643.51 (for an invoice that was 140 days old); $25,000.00 (for two invoices that were 141 days old), and $115,822.95 (for three invoices that were 136 days old). All other payments were issued at least 153 days after the invoice date.

3. *Analysis re § 547(c)(2)(B) prong*

The undisputed facts reveal clear discrepancies between the parties' business practices before and during the preference period. From October of 1999 until late June of 2000, NETtel issued two checks to TMNG. (Barkdoll Dep. Tr. II at Ex. 2 (DE No. 63 at Ex. C)). Check No. 100393, totaling $97,496.74, was issued on January 21, 2000, 46 days after TMNG issued the corresponding invoice (but an older invoice that was then outstanding was 76 days old). Check No. 102952, totaling $277,203.90, was issued over four months later on April 27, 2000, and covered five invoices ranging from 106 to 173 days old (but would have ranged from only 106 days to 143 days old had the oldest invoice been paid instead via the earlier check). NETtel did not make another payment to TMNG during the pre-preference period. The payments in the pre-preference period were not made in response to any payment plan (specifying amounts and frequency of payments) instituted to allay TMNG's concerns regarding the delay in payment.

The onset of the preference period coincided with an unprecedented explosion of payments to TMNG as a result of the payment plan instituted to allay TMNG's concerns about NETtel's accumulated debt

to TMNG. On June 26, 2000, after NETtel had amassed more than $527,089.28 in unpaid invoices owed TMNG,[12] NETtel made its first payment to TMNG in over two months in an amount totaling $23,643.51 for a 115–day old invoice (although other invoices that were 140 days old were then outstanding). The *very next day*, NETtel issued another check to TMNG, this time for $25,000.00, for a 141–day old invoice. Barely two weeks later, on July 17, 2000, NETtel made a bulk payment of $352,663.77 to TMNG for seven invoices ranging from 136 to 161 days old. Two weeks after that, on August 3, 2000, NETtel issued a check for $25,782.00 in response to two invoices that were 84 and 115 days old (even though older invoices that were 153 days old remained unpaid). Thereafter, NETtel issued $25,000.00 checks on August 10, 2000, August 17, 2000, August 30, 2000, and again on September 8, 2000, for invoices ranging from 160 to 189 days old.

These preference period payments, prompted by a payment plan to address substantial arrears, did not correspond to the parties' pre-preference period payment practice. During the pre-preference period, the dollar-weighted average delay between the invoice date and the issuance of NETtel's check was only **104.24** days. During the preference period, the dollar-weighted average delay between the invoice date and the issuance of NETtel's check was **152.39** days, 40.34 days or 46% longer. In other words, NETtel waited much longer on average to pay off the invoices that were eventually paid in the preference period, and then made many more payments than it had in the past to

satisfy those debts (including multiple installments on single invoices).

TMNG argues that because NETtel's pre-preference period payments were made in response to invoices ranging between 76 to 173 days old, and because NETtel's preference period payments were made within or close to that range, the preference period payments were made in the ordinary course of business of the parties. However, as already noted, the range based on the oldest invoices outstanding at the time of payment was only 76 days to 143 days in the pre-preference period, and when the range is computed for the preference period similarly (based on the oldest outstanding invoices being treated as paid first), the only invoice payments made within 143 days of invoice date were: $23,643.51 (on the 140th day after the invoice date), $25,000.00 (for two invoices paid on the 141st day after the invoice date), and $115,822.95 (for three invoices paid on the 136th day after the invoice date), and unlike the pre-preference period payments, they were prompted by a payment plan that required payments in a relatively short span of time.

While NETtel obviously fell behind on its payments to TMNG early in the parties' relationship, it did not feel it necessary to pay its bills—late or otherwise—with any kind of rapidity until it entered the preference period. Prior to entering the preference period, NETtel made two payments to TMNG over the course of eight months. During the preference period, NETtel paid TMNG on an almost weekly basis.[13]

---

**12.** In addition to the invoice amounts paid by the preference period payments of $527,089.28, there were additional outstanding invoiced amounts.

**13.** NETtel issued two checks in response to six invoices in the pre-preference period, a ratio of three invoices for each check. During the preference period, NETtel issued eight checks in response to thirteen invoices, a ratio of 1.625 invoices for each check. Those

NETtel agreed to make weekly payments of approximately $25,000.00 to TMNG in early June so that NETtel could "get current" on its account by the end of July, (Shanahan Aff. ¶ 7, Ex. 3),[14] and those payments were matched up in piecemeal fashion to various outstanding invoices issued by TMNG. (Barkdoll Dep. II at 95–96 (DE No. 85 at Ex. 6)).[15] The result was that NETtel, after paying TMNG a total of $356,318.64 in the eight months prior to the preference period, transferred $527,089.28 to TMNG in a little over two months once the preference period began. NETtel's profligate check writing during the preference period simply does not match its prior conduct with respect to TMNG.

TMNG attempts to explain away these obvious discrepancies by suggesting that NETtel's preference period payments complied with the terms of the payment plan entered into just prior to the onset of the preference period. It cites a number of cases holding that the renegotiation of payment terms during the course of business between two parties does not render payments made pursuant to the renegotiated terms outside the course of business between the parties as a *per se* matter,[16] and urges the court to defer to the payment plan here because to do otherwise would discourage companies from continuing to deal with financially troubled counter-parties.

The cases cited by TMNG do not advance its cause. Many of them do not address the subjective inquiry into a debtor's pre-preference period course of business with a specific creditor required by § 547(c)(2)(*B*) at all, but rather address whether repayment plans can be found to be in accordance with overall industry norms under § 547(c)(2)(C). *See In re Kaypro*, 218 F.3d at 1073–74 (comparing restructuring agreement with applicable

checks did not pay in full each of the invoices to which the payment was allocated. In addition, NETtel waited much longer on average to pay off the invoices that were eventually paid in the preference period. In other words, NETtel made many more payments than it had in the past to satisfy debts (including multiple installments on single invoices), and (on average) did so much longer after the corresponding invoice was issued than it had in the pre-preference period.

14. There is no evidence that NETtel was concerned with keeping its account with TMNG current prior to June of 2000. To the contrary, NETtel issued its first check on January 21, 2000, in response to an invoice dated December 6, 1999, but did not pay off debts arising on November 6, 1999, December 6, 1999, and January 11, 2000. NETtel's second check, issued on April 27, 2000, did not pay off amounts owing from invoices dated February 7, 2000, March 3, 2000, and April 10, 2000. The February, March, and April invoices remained unsatisfied until NETtel began to make weekly installment payments to TMNG in the preference period.

15. For example, NETtel paid off invoice number AR2289, dated March 3, 2000, *before* it paid off invoice numbers AR2271, AR2175, AR2166, AR2167, AR2172, and AR2271, all of which were sent nearly a month prior to invoice number AR2289. It paid off invoice numbers AR2376 and AR2484, dated April 10, 2000, and May 11, 2000, before it paid off invoice numbers AR2293, AR2296, and AR2297, all of which were dated March 3, 2000. And it broke its payment on invoices AR 2271, AR2296, and AR2296 into separate installments, a practice it had never engaged in prior to the onset of the preference period.

16. *See Arrow Electronics v. Justus (In re Kaypro)*, 218 F.3d 1070, 1073–74 (9th Cir.2000) (cited in TMNG Memo. at 12); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 41–42 (2d Cir.1996) (same); *In re Xonics Imaging Inc.*, 837 F.2d 763, 766–67 (7th Cir.1988) (same); *First Software Corp. v. Micro Educ. Corp. of Am.*, 103 B.R. 359, 360–62 (D.Mass.1988) (same); *Armstrong v. John Deere Co. (In re Gilbertson)*, 90 B.R. 1006, 1010–11 (Bankr.D.N.D.1988) (same); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273–75 (Bankr.W.D.Okla.1986) (same).

industry-wide practices to determine if payments made pursuant to that agreement satisfied § 547(c)(2)(C)); *In re Roblin Indus., Inc.*, 78 F.3d at 38–43 (addressing only the unresolved question of whether payments made pursuant to a repayment agreement can satisfy the requirements of § 547(c)(2)(C)); *cf. In re Gilbertson*, 90 B.R. at 1011–12 (payments made pursuant to restructuring agreement satisfied requirements of § 547(c)(2) because such agreements were "common in the [relevant] industry"). These cases are not helpful in resolving the subjective inquiry required by § 547(c)(2)(B). *See Ice Cream Liquidation, Inc. v. Niagara Mohawk Power Corp. (In re Ice Cream Liquidation, Inc.)*, 320 B.R. 242, 251 (Bankr. D.Conn.2005) ("*Roblin Industries* ... [is a] [§ ] 547(c)(2)(C) case[ ]; [it is] inapposite for [§ ] 547(c)(2)(B) purposes....").

Moreover, with one exception, the cases cited by TMNG involve situations where the debtor actually began to make payments under renegotiated terms *before* the debtor entered the preference period. *See In re Kaypro*, 218 F.3d at 1072 (parties entered into payment plan mid–1989; debtor filed for bankruptcy mid–1990); *In re Roblin Indus., Inc.*, 78 F.3d at 33 (restructuring agreement agreed upon many months prior to preference period); *In re Gilbertson*, 90 B.R. at 1008–09 (debtor renegotiated with lender and made initial payment under new repayment terms months prior to bankruptcy); *In re Magic Circle Energy Corp.*, 64 B.R. at 270–71 (restructuring agreement took place over a year before debtor filed bankruptcy).[17] The distinction is important because a debtor, by altering its actual payment history prior to the preference period, establishes a pre-preference course of business with its counter-party that can be compared to the parties' preference period transactions. A payment plan that differs drastically from the parties' past payment history and that does not require payment until the parties are within the preference period cannot establish a baseline of payments to which payments in the preference period can then be compared under § 547(c)(2)(B) to determine whether they were "made in the ordinary course of business or financial affairs of the debtor and the transferee."

The unstated premise of TMNG's "payment plan" argument is that the post-preference period payments made by NETtel should be considered to be in the ordinary course of business between the parties regardless of how those parties conducted business in the past so long as the payment plan was adopted before the preference period commenced and itself was fair to both parties; *i.e.*, commercially reasonable. This would essentially col-

---

**17.** The exception is *First Software Corp.*, where the district court upheld the bankruptcy court's determination that weekly payments of $100,000 commencing in the post-preference period based on an oral promise by the debtor to repay overdue amounts was within the ordinary course of business between the parties. 103 B.R. at 359–61. However, the district court's determination that these transactions fell within the "ordinary course" defense turned at least in part on the fact that the parties to those transactions had engaged in similar repayment agreements in the past, leading the district court to conclude that the payments were not "too frequent" to fall outside the ordinary course of business. *See id.* at 361. In this case, there is no such history between the parties. Additionally, the court in *In re Xonics Imaging, Inc.*, noted in *dicta* that payments on a lease made pursuant to a modification of that lease would satisfy the general requirements of § 547(c)(2) so long as the modified lease was enacted prior to the preference period without specifying whether payment on the modified lease would also need to begin prior to the preference period. 837 F.2d at 766–67. The court does not find this ambiguous hypothetical persuasive one way or the other.

lapse the separate prongs of § 547(c)(2) into a single objective inquiry, divorced from the actual payment conduct of the parties, notwithstanding the plain language of § 547(c)(2) to the contrary.[18] But the comparison of the parties' preference period conduct to their prior dealings is illuminative precisely because it goes beyond a generic, *post hoc* "reasonableness" inquiry and tests whether the later dealings of the parties would have been acceptable to the parties themselves based on their actual conduct.

In that sense, TMNG's "payment plan" argument cuts against its "ordinary course" defense because the plan prompted preference period payments that differed so sharply from the terms under which NETtel and TMNG were willing to operate before NETtel drifted irrevocably into insolvency. Whereas TMNG permitted NETtel to engage in payment in the pre-preference period without a repayment plan in place, the payments in the preference period were made after considerable prodding, with a "plan" being put into place, to achieve a goal of bringing NETtel current—a goal that TMNG obviously had not insisted on in the case of the pre-preference period payments.

█ Most importantly, the court does not agree with TMNG that the overriding concern in preference litigation should be the encouragement of debt restructuring through payment plans. To be sure, that is an important and laudable goal, but it is not the sole or even primary concern of § 547. Rather, "[t]he purpose of the preference statute is to discourage creditors from engaging in unusual collection practices which help dismember the debtor and hasten its slide into bankruptcy." *Miniscribe Corp. v. Keymarc, Inc. (In re Miniscribe Corp.)*, 123 B.R. 86, 90 (Bankr. D.Colo.1991). The statute also "facilitates the goal of equal distribution among creditors of the debtor." *Id.*

█ In this case, NETtel made four times as many payments for nearly twice as much money in the ninety days preceding its bankruptcy as it did in the eight months prior to that time after the invoices had reached a much longer age on average than was experienced in the case of invoices paid prior to the preference period. These payments were made out of a desire to pay all of the debt owed to one specific creditor and in response to frequent communications with TMNG, some of which referenced concerns about NETtel declaring bankruptcy before it had "caught up" on its debts. (Barkdoll Dep. II at 149–50 (DE No. 85 at Ex. 6)). This is exactly the type of scenario for which § 547 is necessary to ensure fairness to all of NETtel's creditors, and not just its aggressive ones. Pointing to pre-preference period discussions which led to these preference period payments, and labeling those discussions a "plan," does not excuse the preference period payments' obvious deviation from the pre-preference period payment practices of the parties.

█ Nevertheless, summary judgment on the § 547(c)(2)(B) defense is not appropriate in favor of Webster with respect to $164,466.46 of the payments made in the

---

**18.** Congress amended § 547(c)(2) as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2002, Pub.L. 109–8 (generally effective Oct. 17, 2005), to require that a party asserting the "ordinary course" defense show either that the transactions at issue were ordinary as between the parties or made according to ordinary business terms.

Far from helping TMNG, this amendment only confirms that the unamended statute, which applies to this proceeding by virtue of the bankruptcy case's filing date, requires satisfaction of *both* inquiries; otherwise, Congress would not have felt it necessary to amend the provision at all.

preference period, although it is appropriate as to the balance of the payments. As discussed earlier, the delay in making payments must be computed by treating each payment as applied first to the oldest invoices. In the pre-preference period, that delay reached a maximum of 143 days from the invoice date. The following preference period payments were applied to invoices that were no older than 143 days: $23,643.51 (for an invoice that was 140 days old); $25,000.00 (for two invoices that were 141 days old), and $115,822.95 (for three invoices that were 136 days old). A factfinder might give considerable weight to this fact and view any payments within 143 days of invoice as "made in the ordinary course of business or financial affairs of the debtor and the transferee" as required by § 547(c)(2)(B). However, that does not suffice to grant TMNG summary judgment as to those payments. A factfinder could reasonably find in Webster's favor by giving greater weight to the fact that the payments were prompted by a payment plan that required payments to be made with an unprecedented rapidity, pursuant to unaccustomed persistence of TMNG in pressing for payments, in an effort to have NETtel bring a huge arrearage more current, thus making these payments fall outside the ordinary course of the parties' prior conduct. The court will thus grant summary judgment in favor of Webster with respect to TMNG's first affirmative defense except as to the $164,466.46 identified above.

4. *Analysis re § 547(c)(2)(C) Prong*

 Issues remain that preclude granting summary judgment regarding whether the transfers were made according to ordinary business terms as required by § 547(c)(2)(C), the third prong that TMNG must prove for the § 547(c)(2) exception to apply. Section 547(c)(2)(C) entails a vertical analysis to determine if the payment of the debt was consistent with the practices of other businesses under similar circumstances. *See In re Tolona Pizza Products Corp.*, 3 F.3d at 1033 (ordinary business terms means the "range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage.") (emphasis removed). To prove this element, TMNG must (1) establish the appropriate industry for the court to consider; (2) demonstrate the industry norm; and (3) prove that the relations between the debtor and the creditor fall within that industry norm. *See In re Roblin Indus., Inc.*, 78 F.3d at 42.

TMNG's expert, Stanley Katz, identified the relevant industry as the telecommunications consulting industry. (Katz Dep. at Ex. C–3 (DE No. 62 at Ex. E)) However, in determining what is the industry norm there is a difficult question of law regarding the extent to which the court may examine a transaction within the industry when the debtor in that transaction was not financially healthy. *Compare Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 227 (3d Cir.1994) (ordinary terms do not include those which prevail in moribund debtor-creditor relations in which the debtor eventually files bankruptcy); *Clark v. Balcor Real Estate Fin., Inc. (In re Meridith Hoffman Partners)*, 12 F.3d 1549, 1553 (10th Cir.1993), *cert. denied*, 512 U.S. 1206, 114 S.Ct. 2677, 129 L.Ed.2d 812 (1994) (ordinary business terms are only those used "in ordinary circumstances, when debtors are healthy"), *with Jones v. United Savings & Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Ark., Inc.)*, 9 F.3d 680, 685–86 (8th Cir.1993) (*"U.S.A.Inns"*) (§ 547(c)(2)(C) satisfied by evidence that it was a common industry practice to work with a troubled debtor if it remitted some

form of payment); *In re Roblin Indus., Inc.*, 78 F.3d at 42 ("If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry.").

■ The court will follow the *U.S.A. Inns* and *Roblin Industries* approach with this caveat: transactions in the distress period that were prompted by aggressive collection efforts that plainly would result in preferring a creditor over other creditors of a debtor must be excluded from the universe of transactions examined to determine what was ordinary. Without that caveat, § 547(c)(2) might create an exception to the preference avoidance power based on transactions in the industry that were themselves of the very preferential character that § 547(b) is designed to redress, including those that were intentionally designed to prefer the creditor. For example, if a creditor, and only that creditor, were to engage in a payment plan calling for the bulk of a debtor's next large cash infusion to be paid to the creditor despite the existence of numerous other significant accounts payable, that transaction ought not be included in the universe of transactions considered in determining what is ordinary in the industry: the transaction is on extraordinary business terms precisely because it treats the creditor in a manner that is extraordinarily different from how other creditors of that debtor are being treated. If a transaction being used for comparison involved a debtor who eventually filed a bankruptcy case, that is a red flag cautioning that the transaction must be scrutinized carefully before it is used as one of the transactions considered in determining what was ordinary in the industry. Katz's opinion fails to address the issues in this fashion, simply opining in a conclusory fashion that:

> TMNG did nothing that was "extraordinary" in connection with the transfers that were received by it. The manner and methods utilized by TMNG to collect amounts owed to it are customary within the telecommunications/consulting industry for consulting firms working with entities like the Debtors. During the Operative Period [meaning the period during which the preference payments were made], it was ordinary for companies like TMNG to handle accounts receivable due from entities like the Debtor in the manner in which TMNG administered this account.

(Katz Rep. at 3.) [19] The court has no way of knowing whether the universe that Katz employed in forming his opinion excluded transactions that were plainly of a preferential character, and that thus ought to be excluded from the universe. Accordingly, TMNG is not entitled to summary judgment based on Katz's opinion.[20]

Nor is Webster entitled to summary judgment on the issue. He only argued that in determining the industry norm no

19. Katz testified similarly on deposition that "[t]he manner in which the amounts were to be collected, in my view, were completely consistent with what has been my experience in the industry in companies that were facing the circumstances similar to what NETtel was facing in the period of mid[-]2000." (Katz Dep. at 35).

20. Katz's opinion would otherwise be admissible evidence despite the lack of specific details regarding other transactions. Fed. R.Evid. 704 (opinion by expert on ultimate issue is not inadmissible). Although a finder of fact would be free to reject that opinion if presented with evidence that would permit a different finding, Webster submitted no expert of his own and no evidence of transactions in the industry from which the finder of fact could form its own view on the issue. Nor did his attorney's cross-examination of Katz on deposition extract details of the universe upon which Katz relied that would permit the finder of fact to conclude that Katz's opinion was unreasonable.

transactions during a period of debtor distress can be taken into account. Webster did not point to any decision taking the approach this court has adopted (an approach which may be unique). TMNG was thus not put on notice that in moving for summary judgment (and in opposing Webster's motion for summary judgment) its expert's opinion should include a limited universe of transactions under the approach this court has adopted. Nothing in the record demonstrates that Katz would not be able to show that his opinion did not include any transactions of the character that this court believes ought not be included in determining the industry norm. Accordingly, Webster has not made the necessary summary judgment showing.

### B. *"New value" defense under § 547(c)(4)*

TMNG also asserts a partial affirmative defense in the amount of $73,161.00 under the "new value" provision found in 11 U.S.C. § 547(c)(4). That provision prohibits the avoidance of a transfer

> to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
>
> (A) not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor....

*Id.*

 The new value defense "is grounded in the principle that the transfer of new value to the debtor will offset the [preferential] payments, and the debtor's estate will not be depleted to the detriment of other creditors." *A.I. Credit Corp. v. Drabkin (In re Auto–Train Corp.),* 49 B.R. 605, 612 (D.D.C.1985). It "encourages creditors to extend revolving credit to financially distressed debtors, thus obviating

the burden of making payments upfront and allowing many such debtors to avoid bankruptcy," *Webster v. MicroLink, LLC (In re NETtel Corp., Inc.),* 323 B.R. 1, 3 (Bankr.D.D.C.2005) (*"MicroLink"*), while at the same time "ensur[ing] equal treatment among creditors by recognizing that preferential creditors conferring a post[-]preference benefit to the estate are essentially returning some portion of the preference to the estate...." *Id.* "Accordingly, 'the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate.'" *Webster v. Harris Corp. (In re NETtel Corp., Inc.),* 319 B.R. 290, 294 n. 4 (Bankr.D.D.C.2004) (quoting *Kroh Bros. Dev. Co. v. Cont'l Constr. Engineers (In re Kroh Bros. Dev. Co.),* 930 F.2d 648, 652 (8th Cir.1991)).

"New value" includes "money or money's worth in goods, services, or new credit...." 11 U.S.C. § 547(a)(2). TMNG asserts that it provided new value in the form of its consulting services and related expenses after all but the last two preference period payments made by NETtel. These services were never "secured" in any sense and were never paid for by NETtel. (Klumb Aff. I ¶¶ 5–6).

Specifically, from July 10, 2000, to September 5, 2000, TMNG issued to NETtel Communications six invoices totaling $177,312.82 for work performed (apparently on behalf of its corporate subsidiary NETtel, which had entered into a contract with TMNG). NETtel did not make any payments for services indicated on these invoices. (Klumb Aff. I ¶¶ 4–6 (DE No. 63 at Appx. Ex. D)).

Each invoice chronicles a range of dates on which these services were performed and provides a value for the services. (Klumb Aff. I at Ex. 1). The invoices do not identify when the work indicated in the invoices actually took place—they only

suggest that work was performed sometime between the first and last days of a particular month. TMNG has prorated the $177,312.82 amount to the lesser amount of $73,161.00 due to the overlap between the range of dates provided on some invoices and NETtel's putative payment dates.

Webster cites *Swallen's, Inc. v. Corken Steel Products Co. (In re Swallen's, Inc.)*, 266 B.R. 807 (Bankr.S.D.Ohio 2000), for the proposition that preferential transfers made in repayment of past debt (as opposed to payments made on "new" debt) are not subject to the new value defense. (DE No. 85 at 22–23). This court has already rejected that argument (and *In re Swallen's, Inc.)* as contrary to both the plain language of § 547(c)(4) and the policy considerations underlying that section in a separate preference action brought by Webster. *See MicroLink*, 323 B.R. at 3. The court sees no reason to contradict its own decision here.

, But there are other problems with TMNG's "new value" defense. First, TMNG assumes that the date used to determine when NETtel made its preference period payments should be the date on which NETtel's checks were issued (see DE No. 63 at Appx. Ex. K) when in fact the determinative date is that on which a particular check is delivered. *In re Kroh Bros. Dev. Co.*, 930 F.2d at 650; *accord Jones v. Aristech Chem. Corp.*, 157 B.R. 720, 722–23 (N.D.Ga.1993); *Maurer v. Hedback (In re Maurer)*, 140 B.R. 744, 746–47 (D.Minn.1992); *Rushton v. E & S Int'l Enterprises, Inc. (In re Eleva, Inc.)*, 235 B.R. 486, 488 (10th Cir. BAP 1999); *Hall–Mark Electronics Corp. v. Sims (In re Lee)*, 179 B.R. 149, 164 (9th Cir. BAP 1995).

The record does not disclose the actual date of delivery of NETtel's preference period payments; it reveals only the earliest possible date on which a specific check could have been delivered (the date when the check was signed) and the latest possible delivery date (the date on which the check was honored). Because the burden rests with TMNG to prove the date of delivery, and because TMNG has submitted no evidence establishing delivery dates for NETtel's payments other than the dates on which the checks were honored, the court must presume that the checks were delivered on that outermost date for purposes of TMNG's motion.

Second, TMNG's invoices do not specify the dates on which its employees provided services to NETtel. Instead, they present a cumulative total for work performed from the beginning of a particular month until the end of that month. In other words, the invoices, without more, establish only that work was performed by TMNG on or after the first of a specific month, but leave open the possibility that, e.g., all of the work was performed on the first day of that month. The problem is that TMNG has not provided any documentation in support of its invoices (e.g., receipts, employee time logs, etc.) that would establish a specific date of performance. In the absence of additional evidence, the court must presume that all of the services provided by TMNG were provided on the first day of the month for purposes of TMNG's motion.

TMNG's evidentiary deficiencies curtail severely the scope of its "new value" defense insofar as TMNG's motion is concerned. Because NETtel's first preference period payment in the amount of $23,643.51 was not honored until July 5, 2000, the court must on this record treat July 5, 2000, as the date of the delivery of the check, and thus conclude that any services rendered prior to July 5, 2000, were performed before the payment was delivered. But because the court must pre-

sume for purposes of TMNG's motion that services evidenced only by TMNG's monthly invoices were performed on the first of the month in question, any invoices for work performed prior to August must be considered to have been rendered prior to NETtel's July 5 payment.

Consequently, four of the five invoices submitted by TMNG in support of its "new value" defense—AR2635 (6/1/00–6/30/00), AR2632 (6/1/00–6/30/00), AR2712 (7/1/00–7/31/00), and AR2713 (7/1/00–7/31/00)—cannot be considered in calculating TMNG's "new value" credit for purposes of summary judgment. The services reflected in these invoices do not qualify as "new value" under § 547(c)(4) because that section "only applies to new value received *after* the preferential transfer." *In re Tax Reduction Inst.*, 148 B.R. at 76 (emphasis in original). Only one invoice, AR2788 (8/1/00–8/31/00), for services rendered and expenses incurred in an amount totaling $15,843.00, constitutes "new value" within the meaning of § 547(c)(4).

■ Webster contests the sufficiency of this invoice insofar as it does not include supporting documentation to show precisely what services were performed or expenses incurred. TMNG, however, has provided an affidavit from company CFO Donald Klumb in which Klumb states that the invoices appended to his affidavit, including the invoice for 8/01/00–8/31/00, "are accurate and reflect work and expenses incurred by TMNG in connection with its work for NETtel on the dates set forth in the Invoices." (Klumb Aff. I ¶ 4). That suffices to establish that new value was conferred on NETtel for the amounts set forth in the invoice, as Webster has not challenged the validity of the debt. Accordingly, the court will grant in part TMNG's motion for summary judgment with respect to its second affirmative defense, but only for an amount totaling $15,843.00.

■ Webster does not contend that TMNG is unable to show (1) that the date of delivery of any of the checks was earlier than the date the check was honored, and (2) that the services covered by an invoice were performed on dates other than just the first date of services indicated on the invoice. Under *Celotex*, Webster must show, based on discovery responses or otherwise, that TMNG lacked evidence to make such showings if he wishes to obtain summary judgment on that basis. 477 U.S. at 325, 106 S.Ct. 2548. The court has no way of knowing whether discovery responses by TMNG reveal that it is unable to make such a showing. Because TMNG has not been given notice that Webster seeks summary judgment based on inability of TMNG to make such showings, Webster is not entitled to summary judgment with respect to the remaining work for which the new value defense is asserted. Although TMNG prorated its invoices, it may be able to show at trial that when the actual dates of service are utilized, at least $48,643.51 worth of the work it performed in June of 2006 and all of the work it performed in May of 2006 (the total worth of which was $36,494.90) occurred sufficiently late to come within the new value defense. Accordingly, it still has a § 547(c)(4) defense (in addition to a § 547(c)(2) defense) to try as to the $48,643.51 paid by the checks dated June 26, 2000, and June 27, 2000, and as to $36,494.90 of the amounts paid by the check dated July 17, 2000. That latter check was sufficiently large that the § 547(c)(4) defense, if valid, can be applied to amounts other than those for which a § 547(c)(2) defense remains to be tried.

However, neither a § 547(c)(2) defense nor a § 547(c)(4) defense is available to TMNG with respect to $200,345.92 of the

amounts paid by the check dated July 17, 2000, and with respect to $109,939.00 of the amounts paid by the last five preference checks issued to TMNG. Accordingly, Webster is entitled to recover those two sums, aggregating $310,284.92.

## IV

## AVOIDABILITY OF THE TRANSFERS TO TMNG TECH

Webster seeks to avoid and recover three payments made by NETtel to Tri–Com, the company now known as TMNG Tech.[21]

### A. *Facts*

The following facts are not in genuine dispute. Tri–Com was in the business of reselling telecommunications equipment, and acted as a middleman for equipment manufacturers and customers. In December of 1999, NETtel and Tri–Com entered into an agreement under which Tri–Com was to provide consulting services to NETtel, with payment terms requiring payment within 30 days after the invoice. (DE No. 76 at Ex. 16). In addition, Tri–Com provided infrastructure support in the form of equipment sales. (*Id.*).

NETtel wrote a check to Tri–Com for $12,672.21 on July 1, 2000, in response to invoice number 3000 issued on June 28, 2000. (*Id.* at Ex. 2). Tri–Com's bank honored the check on July 20, 2000. (*Id.* at Ex. 3).

NETtel wrote another check for $66,042.26 on August 10, 2000. This check was honored by Tri–Com's bank on August 15, 2000. On September 1, 2000, NETtel wrote a third check for $64,877.01. This check was honored by Tri–Com's bank on September 8, 2000. These last two checks were made out to "TriCom Computer Ser-

vices c/o Ingram Financial Serv. Corp." (*Id.* at Exs. 4, 6). Ingram Micro, Inc. ("Ingram"), was the supplier for the equipment sold by Tri–Com to NETtel. Presumably pursuant to Tri–Com's instructions, NETtel mailed its last two checks to a "lock box" account owned by Ingram.

### B. *TMNG Tech's "Ordinary Course" Defense re the $12,672.21 Payment*

■ TMNG Tech seeks summary judgment with respect to its partial affirmative defense under 11 U.S.C. § 547(c)(2). This defense concerns a single transfer of $12,627.21 made by NETtel to Tri–Com on July 1, 2000, in response to an invoice issued just four days prior on June 28, 2000. TMNG Tech argues that the payment was made in the ordinary course of business between the parties as required by § 547(c)(2)(B) because it was made within thirty days of the issuance of the invoice as required by the SOP Agreement.

The court is not impressed by TMNG Tech's argument. Prior to its July 1, 2000 payment, NETtel had made nineteen payments to Tri–Com over the course of the calendar year. *Seventeen* of those nineteen payments (89%) were late under the terms of the SOP Agreement, including payments made 154, 161, 169, and 176 days after the issuance of an invoice. Even the two payments that were issued on time arrived a full thirty days after Tri–Com issued its invoice. On average, NETtel issued checks to Tri–Com eighty-four days after Tri–Com issued its invoice prior to the preference period.

In contrast, NETtel issued its July 1, 2000 payment *four days* after TMNG Tech issued the corresponding invoice. The difference between the timing of this pay-

---

**21.** In September of 2001, TMNG acquired Tri–Com and changed its name to TMNG Technologies, Inc. TMNG Tech remains a wholly owned subsidiary of TMNG.

ment and the timing of all of NETtel's earlier payments by itself marks the payment at issue as outside the ordinary course of business between the parties. But there is also evidence suggesting that Tri–Com exerted significant pressure on NETtel to pay off its debts in the months leading up to the July 1, 2000 payment. Given these undisputed facts, the court concludes that TMNG Tech cannot succeed as a matter of law on its "ordinary course" defense.

TMNG Tech cites one case, *Morrow v. United States (In re Morris)*, 53 B.R. 190 (Bankr.D.Or.1985), in support of its theory that a payment made within a contractual time limit falls within the ordinary course of business *per se.* In that case, the chapter 7 trustee initiated an adversary proceeding against the IRS to recover allegedly preferential transfers consisting of four tax payments. *Id.* at 191. Two of the payments were made in a timely manner; the debtor's prior tax payments were not. *Id.* The bankruptcy court held that the allegedly preferential transfers fell within the scope of the "ordinary course" exception anyway because to hold otherwise "would discourage extensions of credit to a financially troubled debtor." *Id.* at 193.

Unlike the case in *Morris*, there is evidence in this case that NETtel's July 1, 2001 payment was made in response to a demand from Tri–Com for immediate payment on a shipment of computer services to NETtel's San Diego office. In that respect, the facts in this case resemble more closely the facts in *In re Miniscribe Corp.*, where the bankruptcy court held that a preference period payment made within the credit terms of a contract nevertheless fell outside the ordinary course of business between the parties where the debtor made late payments habitually and

appeared to make the preferential payment in response to economic pressure in the form of phone calls and faxed letters from the debtor's counter-party. 123 B.R. at 93–95.

The confluence of pressure from the debtor's counter-party and an unusually swift payment on an invoice suggests that NETtel's payment was made not out of a desire to abide by the terms of the SOP Agreement, but rather out of a need to repay one aggressive creditor right away to receive necessary goods from the creditor. Nothing in the record remotely suggests that NETtel made "cash on delivery" payments to Tri–Com prior to the preference period. The court will grant summary judgment in favor of Webster on this issue and deny TMNG Tech's motion for summary judgment with respect to its first affirmative defense.

C. *TMNG Tech's "Contemporaneous Exchange" Defense under § 547(c)(1) re the $12,672.21 Payment*

■ TMNG Tech asserts a "contemporaneous exchange" defense to Webster's preference action in regards to the July 1, 2000 payment of $12,672.21.[22] 11 U.S.C. § 547(c)(1). Pursuant to § 547(c)(1), a trustee may not avoid a transfer

(1) [t]o the extent that such transfer was

(A) intended by the debtor and the creditor . . . to be a contemporaneous exchange of new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

*Id.*

■ "The crucial inquiry under section 547(c)(1) is whether the parties intended

---

**22.** In its opposition to Webster's summary judgment motion, TMNG Tech also requests summary judgment with respect to this argument notwithstanding its failure to raise the point in its own motion for summary judgment. (DE No. 79 at 8). .

the exchange to be contemporaneous from the outset." *Drabkin v. Finalco, Inc. (In re Auto–Train Corp.)*, 55 B.R. 69, 71 (Bankr.D.D.C.1985). There is some evidence in the record that the parties intended for NETtel's July 1, 2000 payment to be a contemporaneous exchange for computer servers delivered shortly after June 28, 2000. A check request form dated June 28 indicates that a check in the amount of $12,627.21 was needed to pay for "Cisco [s]ervers" for the "[n]ew San Diego sales offices." (Barkdoll Dep. II at Ex. 17 (DE No. 63 at Ex. C)). The check request form indicated that payment for the servers would be due upon delivery. (*Id.*)

That same day, Tri–Com issued invoice 3000 for $12,627.21. According to Tri–Com employee Kenneth Neimo, Tri–Com's practice was to issue an invoice only after the goods billed were actually shipped. (Neimo Dep. at 9 (DE No. 79 at Ex. A)). Two days later, NETtel's senior director of technical operations sent a letter thanking Tri–Com for its agreement to set up "equipment" for NETtel's "San Diego sales office start-up." (Donovan Dep. at Ex. 6 (DE No. 79 at Ex. C)). Adcock attached a copy of the check to be issued on July 1, 2000.(*Id.*). The check listed invoice No. 3000; *i.e.*, the invoice for the Cisco servers, as its corresponding invoice. (Bardoll Dep. II at Ex. 17).

The court can infer from this evidence that (1) NETtel intended to make immediate payment on computer servers shipped on June 28, 2000; and that (2) a check was issued for those servers just four days after Tri–Com shipped the servers. While TMNG Tech's evidence is far from conclusive, viewed in the light most favorable to TMNG Tech (as the party opposing Webster's motion for summary judgment), it would satisfy the requirements of the "contemporaneous exchange" defense if

deemed credible and accurate by the court. The court will deny Webster's motion for summary judgment with respect to TMNG Tech's second affirmative defense regarding the $12,627.12 payment.

D. *TMNG Tech's Argument That the $66,042.26 and $64,877.01 Payments Were Not to or for the Benefit of Tri–Com*

 Finally, TMNG Tech raises an additional argument in opposition to Webster's motion for summary judgment. It argues that there is a genuine dispute of material fact with respect to whether two of NETtel's three allegedly preferential payments (the ones for $66,042.26 and $64,877.01) were to or for the benefit of Tri–Com.

Section 547(b)(1) of the Bankruptcy Code requires that avoidable preferences be made "to or for the benefit of a creditor." TMNG Tech argues that there is an issue of material fact as to whether Tri–Com actually received the last two transfers from NETtel (for $66,042.26 and $64,877.01, respectively) because the checks verifying those two transactions were deposited into a "lock box" owned by Tri–Com's supplier, Ingram, and the checks show the payee as "Tri Com Computer Services, Inc. c/o Ingram Financial Serv. Corp." (Barkdoll Dep. Tr. II at Ex. 18–19 (DE No. 79 at Ex. B)). This argument assumes that the language on the payee line regarding Ingram authorizes a bank making payment on the note to pay Ingram without the indorsement of Tri–Com.

Under the revised Uniform Commercial Code as adopted by the District of Columbia, "[t]he person to whom an instrument is initially payable is determined by the intent of the person ... signing as ... the issuer of the instrument." D.C.Code § 28:3–110(a). If the instrument is pay-

able to two or more persons alternatively, any of the named payees can negotiate, discharge, or enforce the instrument, but if it is payable to two or more persons jointly, all named payees must indorse the instrument. *Id.* at § 28:3–110(d). An ambiguous instrument is presumed to be payable in the alternative. *Id.* Moreover, "[i]f an instrument is payable to ... [a] person described as agent or similar representative of a named or identified person, the instrument is payable to the represented person, the representative, or a successor of the representative...." *Id.* at § 28:3–110(c)(B).

Ordinarily, the checks in question would be payable solely to Tri–Com as a matter of law. The checks were written to Tri–Com "c/o" Ingram, not to "Tri–Com or Ingram" or "Tri–Com/Ingram." *Cf. Dynalectron Corp. v. Union First Nat'l Bank*, 488 F.Supp. 868, 869 (D.D.C.1980) (check payable to two parties separated by virgule should be construed as intended to be payable in the alternative because "[t]he virgule is normally used to separate alternatives"). As one Ohio state court has noted in construing the meaning of the phrase "c/o" on the payee line of a check,

[T]he symbol "c/o" ... [is] not ambiguous and [does] not operate to designate ... an alternative co-payee.... The symbol "c/o" means "in care of" and means that another only has "custody" or "temporary charge" over an item belonging to another.... The symbol is "used especially in the phrase care of or in care of on mail sent to a person through another person or other agency...."

*Geraldo v. First Dominion Mut. Life Ins. Co.*, 2002 WL 31002770, *6 (Ohio Ct.App. Sept. 6, 2002) (unpublished opinion) (quoting *Buckeye Foods v. Cuyahoga County Bd. Of Revision*, 78 Ohio St.3d 459, 678 N.E.2d 917, 919 (1997)).[23]

Although the exact statutory language relied upon by the court in *Geraldo* is missing in the current UCC,[24] the reasoning of that case is persuasive. UCC § 3–110 contemplates the existence of multiple payees in a limited number of situations, only two of which are conceivably applicable here: (1) when the payee line indicates that the check is to be paid to more than one person; and (2) when the check is addressed to a person in that person's representative or fiduciary capacity. Ingram does not fit into either of those cate-

---

**23.** *Geraldo* involved a suit for conversion filed by the estate of a deceased stock account owner against the owner's former financial adviser. 2002 WL 31002770 at *1. The lawsuit centered around checks issued to the decedent "c/o" the defendant. *Id.* The defendant indorsed the checks and collected the proceeds for himself. *Id.* On appeal to the Court of Appeals of Ohio, the defendant argued that he could not have converted the check proceeds because he was a named payee or, alternatively, an agent of the decedent. *Id.* at *6. The Ohio Court of Appeals rejected these arguments, holding that "[a]t best, the 'c/o' language on the checks only acted to designate [the defendant] as the person who could temporarily take charge of the checks for [the decedent], the sole named payee." *Id.*

**24.** *Geraldo* was decided under Ohio's equivalent of the prior version of the UCC, which included a provision (since deleted) to the effect that an instrument made payable to a named person with words describing that person as anything other than an "agent or officer of a specified person" or "as any other fiduciary for a specified person or purpose" should be ignored and the check construed as "payable to the payee unconditionally...." *Id.* at *6 (quoting Ohio Rev.Code § 1303.16(A)-(C)). Having concluded that the shorthand "c/o" did not signify that the defendant was an agent or fiduciary for the decedent, the court ignored the language entirely in concluding that the decedent was the lone payee.

gories. Accordingly, it could not have been a payee of NETtel's checks.

TMNG Tech has produced other evidence, however, which suggests that it never received the last two payments from NETtel. Former Tri–Com principal Kenneth Neimo testified at his deposition that Tri–Com executed a limited power of attorney allowing Ingram to enforce any checks sent to Ingram's "lock box" account. (Neimo Dep. at 38–39 (DE No. 79 at Ex. A)).[25] Neimo further testified that the amounts sent to the "lock box" covered debts owed to Ingram primarily if not exclusively because Ingram was the actual supplier of equipment to NETtel while Tri–Com's only role was that of a broker. (Neimo Aff. at 40–41). Finally, TMNG Tech's Chief Financial Officer, Donald Klumb, submitted an affidavit stating that he had reviewed Tri–Com's accounts and could find no payment to Tri–Com corresponding to the checks written by NETtel. (Klumb Aff. II ¶¶ 2–5, Ex. 1 (DE No. 79 at D)).

■ Webster counters that payments to Ingram benefitted Tri–Com nonetheless because Tri–Com was contractually obligated to satisfy any unpaid debts owed by its customers to Ingram. The only evidence to support this assertion, however, is unauthenticated copies of a Sale and Assignment Agreement between Ingram and Tri–Com and an Accounts Receivable Purchase Agreement between Ingram and Tri–Com. (DE No. 76 at Exs. 14–15). The court cannot consider such evidence on a motion for summary judgment. *See* Fed.R.Evid. 901; *Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*, 160 B.R. 1, 6

(Bankr.D.D.C.1993) (exhibits not admissible into evidence for purposes of summary judgment with supporting affidavit stating that exhibits are true and accurate copies of the items described). Consequently, there is no evidence on the record before the court of an indirect benefit to Tri–Com due to its contractual arrangement with Ingram.

Even without Webster's inadmissible exhibit, there is some evidence on the record that Tri–Com benefitted from NETtel's payments. First, there are the checks themselves, which, as noted above, entitle only Tri–Com to payment on their face. TMNG Tech has presented evidence to rebut the presumption that the checks were payable only to Tri–Com, but the court need not—and, indeed, cannot—make any determination as to whether that evidence is credible. Webster has also introduced evidence in the form of CAP account statements that suggest that payment was actually made to Tri–Com, not Ingram. (DE No. 76 at Exs. 5, 7). This evidence creates a genuine issue of material fact with respect to whether Tri–Com benefitted from NETtel's last two payments in the preference period. The court will deny summary judgment in favor of either party on this issue.

## V

### CONCLUSION

For the reasons set forth above, the court will grant in part and deny in part the cross-motions for summary judgment

---

**25.** This evidence may be crucial to the survival of TMNG Tech's case because without proof that Ingram was authorized to enforce NETtel's checks, Tri–Com might have been able to pursue an action for conversion against the drawer bank for honoring a check with an unauthorized indorsement assuming that NETtel's delivery of the check into the "lock box" account constituted a vicarious delivery to Tri–Com via Ingram's "lock box." *See* D.C.Code § 28:3–420(a). That right likely would constitute a benefit to Tri–Com within the meaning of § 547.

as reflected by the order that follows in accordance herewith.